```
                    UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF TENNESSEE
                          NASHVILLE DIVISION
```

MONA L. GANT,                    )
                                 )
        Plaintiff,                )
                                 )
        v.                        )    NO.  3:05-1005
                                 )    Judge Campbell/Bryant
GENCO I. INC., d/b/a Genco       )    **Jury Demand**
Distribution,                    )
                                 )
        Defendant.                )

**To: The Honorable Todd J. Campbell**

### REPORT AND RECOMMENDATION

The Court referred this case to the Magistrate Judge for a report and recommendation on all dispositive motions (Docket Entry No. 2). The case thereafter was transferred by Magistrate Judge Brown to the undersigned (Docket Entry No. 28).

This is a civil action alleging employment discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., and a supplemental state claim predicated on the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 et seq.

The defendant has filed a motion for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure (Docket Entry No. 33). Plaintiff has filed a response in opposition (Docket Entry No. 40). For the reasons stated below, the undersigned **RECOMMENDS** that defendant's motion for summary judgment be **GRANTED**.

# I. Facts

Plaintiff, Mona Gant, was first employed by the defendant in November 2001. She initially worked as a data processor, and later as a reversal clerk, and her work was regarded as satisfactory in those positions. In August 2003, Ms. Gant was promoted to Quality Assurance ("QA") Team Lead, a position in which she was required to supervise a team of auditors on the second shift. While her annual performance reviews before August 2003 generally rated Ms. Gant as "meets job requirements" or better, her annual performance review for the QA Team Lead position, dated February 5, 2004, included several "needs improvement" ratings. Explanations for these ratings included "difficulties in establishing and maintaining good relationships," and stated that "her participation in group problem solving situations needs to improve." This annual performance review bears a notation in Ms. Gant's handwriting: "Antagonism, hostility, environment, like (sic) of support."

Ms. Gant also had difficulties with employees under her supervision. She complained in her deposition that one male employee named Jason cursed her and refused to do tasks that she assigned to him. She reported this to her supervisor, Jim Pruitt, and Pruitt came the next day and talked with the offending employee. His disrespectful behavior did not stop, but did improve. Ms. Gant also had problems with another employee under her supervision, Osman Said. Ms. Gant stated in her deposition that

2

Mr. Said complained about working and did not want to do what she asked him to do. She reported this to her supervisor, Mr. Pruitt, and Pruitt promised to talk with Said and offered Ms. Gant advice on how to handle the situation. The problems with Mr. Said continued, and, when Ms. Gant complained further, her supervisor explained that Mr. Said was from Somalia, and had a cultural problem with being supervised by a woman. Her supervisor encouraged Ms. Gant to be patient and to work to improve her relationship with Mr. Said. Ms. Gant testified that she had similar problems with another employee in her team, Ali Hussein, who also was from Somalia. Her supervisor again encouraged her to be patient because "he [Hussein] was a Somalian and they don't like to take orders from women." Ms. Gant reported that her problem with Mr. Hussein eventually resolved itself after a couple of months.

In May 2004, Ms. Gant was informed by her supervisor that one of the employees under her supervision had complained that she had been verbally abusive to him and had called him derogatory and demeaning names, including "jackass." The supervisor told Ms. Gant that the company would conduct an investigation of these complaints. During this investigation, Ms. Gant was reassigned to another position in a different department, but her pay and benefits were not affected. At the conclusion of this investigation, Ms. Gant's employment was terminated, effective June 7, 2004. The stated reason for her termination was "belligerent

3

behavior and disrespect for Teammates, Management, and GENCO policies" in violation of GENCO'S General Rules of Conduct and Harassment Policy.

Ms. Gant grieved her termination through the two levels of the company's internal grievance procedures. She alleged that her termination was based upon "a double standard and discrimination of color." She denied calling another employee a "jackass," and she denied being verbally abusive or disrespectful to any employee. The finding that Ms. Gant was guilty of violation of the company's Harassment and General Rules of Conduct Policy was affirmed, but the company decided to allow Ms. Gant to return to work in a different department and a position that paid less, provided she would accept a final written warning and make a private apology to the employee, Mr. Said. Ms. Gant refused the reinstatement terms, and her termination was finalized.

Ms. Gant lodged a charge of discrimination based on race with the Tennessee Human Rights Commission on July 6, 2004, and the EEOC sent her a right-to-sue letter on July 22, 2005. Plaintiff thereafter filed this action.

## II. Analysis

To grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits on file, establish that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A party seeking

4

summary judgment bears the initial burdens of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Thus, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The nonmoving party must thereafter produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(quoting Fed.R.Civ.P. 56(e)).

Although a plaintiff is entitled to a review of the evidence in the light most favorable to her, the nonmoving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Title 42, Section 2000e-2(a), of the United States Code provides in pertinent part as follows:

> It shall be an unlawful employment practice for an employer —
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; . . .

Tennessee Code Annotated, section 4-21-401(a)(1), contains

5

virtually identical language, and makes employment discrimination prohibited by federal law a violation of state law as well.

Ms. Gant, an African-American, asserts that she was unlawfully discharged from her job at GENCO because of her race, and that white employees in essentially similar circumstances were treated more favorably. This "disparate treatment" case is subject to the following tripartite analysis, with the burden of proof remaining with the plaintiff at all times: (1) the plaintiff must establish a *prima facie* case of discrimination, (2) the employer must offer evidence of a legitimate, nondiscriminatory reason for its actions, and (3) the plaintiff must prove that the reason offered is in fact a pretext for intentional discrimination. Kent County Sheriff's Ass'n v. County of Kent, 826 F.2d 1485, 1492 (6th Cir. 1987)(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801 (1973)).

The general elements required for a plaintiff to prove a *prima facie* case are: (1) that she belongs to a racial minority; (2) that she was discharged; (3) that she was qualified for the position; (4) that she was replaced by a person outside the protected class.[1] Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992)(citing McDonnell Douglas, 411 U.S. at 802; Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)). As an

---

[1] Plaintiff alternatively can establish her *prima facie* case by presenting credible, direct evidence of discriminatory intent. See Terbovitz v. Fiscal Court of Adair County, 825 F.2d 111 (6th Cir. 1987). However, Ms. Gant has not presented any such direct evidence here.

6

alternative, the fourth "replaced-by-a-nonprotected-person" element of the criteria can be satisfied by showing, in addition to the first three elements, that "a comparable non-protected person was treated better." Id. at 582-83. It appears that it is under this formula that Ms. Gant seeks to make out her case. She alleges that although she was investigated and terminated by GENCO, two white employees, Sandra Corum and Brian Sanders, in similar circumstances were neither investigated nor terminated. (Gant deposition, Docket Entry No. 37-1, p. 25). According to Ms. Gant, these "facts" establish a *prima facie* case that white employees, guilty of conduct of comparable seriousness to the conduct for which she was fired, received more lenient treatment.

The Sixth Circuit has held that to be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. Mitchell, 964 F.2d at 583 (citing Mazzella v. RCA Global Communications, Inc., 642 F.Supp. 1531 (S.D. N.Y. 1986), aff'd, 814 F.2d 653 (2d Cir. 1987); Lanear v. Safeway Grocery, 843 F.2d 298 (8th Cir. 1988); Cox v. Electronic Data Sys. Corp., 751 F.Supp. 680 (E.D. Mich. 1990)). In Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796 (6th Cir. 1994), the court further explained that the plaintiff was simply "required to prove that all of the relevant

7

aspects of his employment situation were 'nearly identical' to those of [the nonminority's] employment situation." Id. at 802 (emphasis added). In a later decision, the Sixth Circuit further qualified the factors discussed in the Mitchell case, as follows:

> Courts should not assume, however, that the specific factors discussed in Mitchell are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, as this court has held in Pierce, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the relevant aspects."

Ercegovich v. Goodyear Fire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)(citing Pierce, 40 F.3d at 802)(emphasis added).

Thus, to determine whether Ms. Gant has carried her burden to prove a *prima facie* case, the Court must determine whether she has shown that the status of co-employees Corum and Sanders, with whom plaintiff seeks to compare herself, is similar to her status "in all of the relevant aspects." From the record it appears that Osman Said, one of the team members under Ms. Gant's supervision, complained to Rob Duenas, IC supervisor, about misconduct by Ms. Gant on the job. Specifically, Mr. Said reported to Mr. Duenas that Ms. Gant (1) had called him (Said) a "jackass, dumbass, etc;" (2) had assigned him certain pallets to audit to the exclusion of other QA auditors; (3) had questioned him about the number of pallets he audited during the night, asserting that he

8

was too slow; (4) had abused other teammates within the QA department; (5) sat down at her desk all night once the IC supervisor/manager left for the day; (6) repeatedly overruled what her supervisor had directed the teammates to do; (7) generally "put him down" in front of his teammates; and (8) yells at him, curses at him and "gets up in my face" and accuses him of being lazy. Jim Pruitt, Ms. Gant's supervisor, conducted an investigation of these claims, and questioned other teammates about Mr. Said's complaints. Other teammates confirmed that Ms. Gant was "constantly disrespectfully (sic) to [Said]," that she frequently ordered Said to move all pallets and directed the other teammates to sit down and watch. Ali Hussein, one of the teammates, reported that Ms. Gant had called him a "jackass," and was disrespectful to some of the teammates. Katherine Miguel, a second shift reversal clerk, reported in a written statement that Ms. Gant "has been very rude and hateful to most of the QA teammates a lot of the time," that she "sits at her desk or at Rob's desk on the phone or she can't be found most of the time," that she "talks about the teammates (QA Teammates) like they are trash," "she calls them (QA Teammates) stupid and lazy," and "when she [Ms. Gant] has to repeat herself she gets angry." Ms. Miguel further stated that Ms. Gant "does nothing but complain about the teammates (QA Teammates) and says that they are all stupid and lazy," that "most of them (QA Teammates) are afraid of her, they feel their job is in jeopardy," and that the QA teammates say that "if they tell on her (Mona) and

9

she finds out who said the complaint she (Mona) confronts them and makes a fuss over it and tells them they (QA Teammates) don't know anything." (Declaration of Tony Newman, Exhs. 2 and 4, Docket Entry Nos. 39-2 and -4). Tony Newman, the facility manager, testified in deposition that when he talked with Ms. Gant about these accusations "she denied everything except calling Osman [Said] a jackass, and she said she was just joking when she said that." (Newman deposition, Docket Entry No. 38, at p. 3). Ms. Gant, in her deposition, denied calling any employee a "jackass." (Gant deposition, Docket Entry No. 37-1, p. 13).

To determine whether the situations of the two white employees to whom Ms. Gant seeks to compare herself, Sandra Corum and Brian Sanders, are "similar in all relevant aspects" to that of Ms. Gant, the Court must look to the deposition testimony of Ms. Gant. Ms. Gant testified that Brian Sanders, a white team lead, "called this girl a crackhead." (Gant deposition, Docket Entry No. 37-1). With respect to the company's response to this incident, Ms. Gant testified: "And the next day, I'm thinking they wrote him [Sanders] up, because he told me they wrote him up." (Id.) Mr. Sanders was not fired. Ms. Gant further testified that Sandra Corum, a white lead employee, "was disrespectful to a supervisor and walked off the job." (Id. at p. 25). When asked what Ms. Corum said that was disrespectful, Ms. Gant testified: "She said that the supervisor wasn't no good, and that she wasn't any good, and that she wasn't no good supervisor. . . . I mean, she was –

10

disrespected the supervisor. I mean, she was insubordinate." (Id.). Ms. Corum was not fired, but "they moved her." (Id. at p. 15). The defendant has stated that, at all pertinent times, Ms. Sanders and Ms. Corum worked in different departments and under different supervisors than Ms. Gant. (Newman declaration, Docket Entry No. 39-1). Nevertheless, GENCO's General Rules of Conduct and Harassment Policy, for violations of which Ms. Gant was fired, applied to all GENCO employees.

From a review of the record before the Court, the undersigned finds that the situation of Ms. Gant and those of Mr. Sanders and Ms. Corum are not similar "in all of the relevant aspects." Most importantly, it appears from the evidence before the Court that the incidents of disrespect for fellow employees attributed to Mr. Sanders and Ms. Corum were isolated occurrences. In marked contrast, the company's investigation of Ms. Gant evidenced a pervasive, ongoing pattern of abusive and harassing conduct toward employees under her supervision. Ms. Gant's conduct included not only a pattern of disparaging and derogatory name-calling, but also unfair, repetitive and punitive work assignments to employees who did not enjoy her favor, and a generally intimidating management style that had cost her the respect of employees under her direction. There is no evidence of similar ongoing and pervasive misconduct by either Mr. Sanders or Ms. Corum, and, therefore, their status is not similar to that of Ms. Gant "in all relevant aspects." Accordingly, the undersigned finds

11

that Ms. Gant has failed to prove that a comparable nonprotected person was treated better, the fourth element of a *prima facie* case as required by McDonnell Douglas and Mitchell v. Toledo Hospital.

Moreover, the undersigned finds that GENCO has offered evidence of a legitimate, nondiscriminatory reason for its actions, and that Ms. Gant has failed to carry her burden of proving that the company's reason offered is a pretext for intentional discrimination. See Kent County Sheriff's Ass'n v. County of Kent, 826 F.2d 1485, 1492 (6th Cir. 1987). Although Ms. Gant disputes and denies the claims and accusations of her fellow employees in the statements they gave to the company, she does not dispute that those statements were in fact given. "Courts have repeatedly held that the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a race discrimination claim to withstand a motion for summary judgment." Mitchell v. Toledo Hosp., 964 F.2d 577, 585 (6th Cir. 1992)(citing Irvin v. Airco Carbide, 837 F.2d 724 (6th Cir. 1987) and Ridenour v. Lawson Co., 791 F.2d 52 (6th Cir. 1986)).

### III. RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that defendant's Motion for Summary Judgment be **GRANTED** and that the complaint, as amended, be **DISMISSED** with prejudice.

Under Rule 72(b) of the Federal Rules of Civil Procedure,

12

any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation, with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in this Report in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).

**ENTERED** this 29th day of March, 2007.

s/ John S. Bryant
JOHN S. BRYANT
United States Magistrate Judge

13